In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-19-00140-CV**

**IN RE COMMITMENT OF CHRISTOPHER CHARLES VALSIN**

**On Appeal from the 172nd District Court
Jefferson County, Texas
Trial Cause No. 1002-Y**

**MEMORANDUM OPINION**

A jury unanimously determined beyond a reasonable doubt that Christopher Charles Valsin is a sexually violent predator pursuant to the Sexually Violent Predators Act. *See* Tex. Health & Safety Code Ann. §§ 841.001–062. Valsin presents two issues challenging the trial court's judgment: Valsin challenges the factual sufficiency of the evidence to support a finding beyond a reasonable doubt that he is a sexually violent predator and asserts he was harmed when the trial court admitted evidence before the jury of an allegation of a prior sexual offense that a grand jury "no billed." *See id.* § 841.003(a)(2). Having reviewed the record and arguments asserted, we affirm the trial court's judgment.

## I. Evidence

### A. Sexually Violent Offense Convictions

Valsin has two separate convictions for sexual assault of a child. The first conviction arose from a 1996 assault against an unrelated fifteen-year-old victim ("Gina"), when Valsin was 28 years old.[1] After entering a plea of guilty, Valsin received deferred adjudication for the first offense. However, in 2002, after violating multiple terms of his community supervision, he was adjudicated guilty of the offense.[2] Valsin was convicted for a second offense of sexual assault of a child after entering a guilty plea, which stemmed from a 2001 incident with a thirteen-year-old victim ("Anna") who lived in his neighborhood and was the same age as his stepson. Valsin was around the age of 33 years at the time of the second offense. This second offense occurred while he was on community supervision for the first offense.

### B. Other Convictions

The evidence introduced at trial also established Valsin has prior convictions for prostitution and indecency with a child by exposure. The indecency with a child by exposure offense involved Anna's three-year-old cousin ("Nancy"), to which

---

[1] We refer to the victims in this case using pseudonyms to protect their identities. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[2] Valsin testified these violations included being unsupervised around children, possession of pornography, missing sex offender treatment classes, and nonpayment of fees.

Valsin pleaded guilty. He also has a conviction for "tampering with an ID number[]" involving possession of a weapon on which the serial number had been removed.

## C. Other Arrests/Offenses Not Resulting in Convictions

Evidence at trial showed that Valsin had been arrested for assaulting his ex-wife, but she decided not to pursue criminal charges and no conviction resulted from the incident. Additionally, of import to this appeal, the trial court admitted evidence, over defense objection, that Valsin's stepdaughter made an outcry when she was age twelve, alleging Valsin repeatedly sexually assaulted her beginning when she was ten years old. The grand jury ultimately no billed the charges pertaining to the stepdaughter. The trial court overruled Valsin's objection to this evidence but read his requested limiting instruction to the jury multiple times throughout the proceedings and included the limiting instruction in the formal written jury charge. Valsin agreed he has been arrested eight to ten times in his lifetime; including for unlawful carrying of a weapon, trespass, and multiple incidents of physical assault against women.

## D. Trial Testimony

### 1. Dr. Timothy Proctor

Forensic psychologist Dr. Timothy Proctor testified for the State. Proctor was asked to evaluate and provide an opinion if Valsin has a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence. Proctor's evaluation

3

methodology included reviewing records from multiple sources, personally meeting with Valsin for approximately three hours, and performing certain psychological assessment tests.[3] Proctor testified that the records he reviewed were the same type of materials reviewed and relied on by experts in his field.

Proctor testified that he scored three actuarial measures, including the Static-99R, the Risk for Sexual Violence Protocol ("RSVP"), and the Hare Psychopathy Checklist ("PCL-R"). Proctor said there is no test that will specifically tell you if someone has a behavioral abnormality. Proctor explained that the actuarial tests can assist "by giving information about the person's personality, how their mind works, and what their risk is of committing a sexually violent offense."

On the Static-99R, Proctor scored Valsin as a 3, which "indicates an average level of risk[]" compared to other sex offenders. Proctor said the Static-99R authors identified two groups, routine and high-risk/high-needs, and Valsin is most appropriately compared to the high-risk/high-needs group. Proctor explained that he felt Valsin fell within the high-risk/high-needs group due to his re-offending and multiple evaluations that determined he has a behavioral abnormality. Proctor testified that he did not believe the Static-99R risk level of 3 was accurate, rather he

---

[3] Proctor testified that he received and reviewed offense reports about sexual offenses and other criminal behavior, court records, prison systems records regarding his behavior, and records from mental health professionals who have interviewed him there, some mail, phone calls that he made while incarcerated, and depositions.

4

felt Valsin would be more accurately categorized in a level just above the average range based on the totality of the information; he described this as an "adjusted actuarial approach[]" which meant he used the published measures only as a starting point. He testified that there are additional risk factors that indicate someone could be at a higher risk of re-offending. He explained the Static-99R does not account for all risk factors but is a starting point for evaluating the person. Proctor cautioned that just because Valsin did not score high on the Static-99R, it does not mean that he does not suffer from a behavioral abnormality. On the PCL-R, Proctor scored Valsin as a 19 out of 40, with the average PCL-R score being 22. Proctor testified that the chances for re-offending for those in the high-risk/high-needs group was 14 percent at 5 years and 22.9 percent at 10 years.

Proctor testified that he considered convictions and allegations of assault that did not result in convictions as pertinent to his evaluation. With respect to the allegations by Valsin's stepdaughter, Proctor stated that "if [the no billed offense] were all there was in Mr. Valsin's history, I wouldn't put much weight on it[]" but "when you have a history of sexual offending against children and then you have within that this allegation . . . in the context of what we already know, is really important[,]" and "it wasn't just one time[,] [i]t had actually been going on since she was 10." Proctor testified "[t]hat's important data that has to be considered." He

explained that this was important to get a "complete picture" of what was going on with Valsin.

Proctor defined sexual deviance as "being sexually aroused by nonconsenting persons in some way." Proctor testified that Valsin was sexually deviant in the past and continues to be. In relation to a behavioral abnormality, he noted two of the most "widely considered general risk factors are sexual deviance, and . . . antisocial lifestyle." Proctor explained Valsin's past behaviors demonstrated this, and at times, he continued to acknowledge his ongoing sexual interest in underage teenagers. Proctor explained that sexual deviance is a chronic condition, especially sexual attraction to children.

Proctor discussed Valsin's risk factors and protective factors to re-offending. He described Valsin's offenses and persistence after punishment as "a really significant indicator of increased risk." He also testified that history of supervision problems is an additional risk factor, which Valsin had, and it can affect one's risk of re-offending after punishment. Proctor testified that Valsin reported having 30 or more sexual partners, and this sexual promiscuity constitutes an additional risk factor, which he explained shows the strength of an individual's sexual urges and one's inability to regulate them. He testified these behaviors indicated Valsin "was being driven by the sexual desires, as opposed to planning and thinking about what he was doing." He also noted Valsin does not have a history of stable relationships

and he has sexually offended with others while he was in long-term relationships. Proctor testified that despite Valsin's representations that he has a low sex drive, while in prison Valsin communicated with three different women about romantic things, which shows his continued focus on sex and having multiple relationships at the same time. Proctor said that Valsin's protective factors against reoffending would include his age, social support from his mother and sister, and his completion of sex offender education.[4]

Proctor testified that he did not fully diagnose Valsin with any specific paraphilias, which he described as various sexual disorders; however, he noted "rule-out consideration" of pedophilia.[5] He explained that pedophilia was a sexual attraction to prepubescent children. Proctor testified that he was very conservative by not diagnosing Valsin with pedophilia, but he felt evidence existed to warrant it. Although he did not consider Valsin a psychopath, Proctor diagnosed him with "[u]nspecified personality disorder with antisocial traits" and gave a rule-out

---

[4] Proctor distinguished between sex offender education and sex offender treatment. He explained that while Valsin had completed sex offender education, which lowered his risk some, he had not completed sex offender treatment, which would include working through his offense cycles. He testified Valsin's prior sex offender treatment was not enough to significantly reduce his risk.

[5] Proctor explained that a "rule-out" diagnosis meant "the opposite" of ruling something out and no longer considering it; rather, he said that "while I didn't fully diagnose it, it certainly warrants consideration and continued consideration."

diagnosis of antisocial personality disorder. Proctor explained how sexual deviance coupled with antisocial personality disorder heightens one's risk.

Proctor explained that Valsin's pattern "demonstrates impairment of his emotional and volitional capacity in controlling his behavior." Proctor concluded that Valsin has a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence.

### 2. Valsin's Testimony

When Valsin testified before the jury, he admitted to some version of the sexual assaults, but he attempted to minimize his culpability in each incident. Valsin testified that he believed Gina was a willing participant, even though he was aware that she could not consent because of her young age. He also testified that Anna came to his house, took her clothes off, and asked him if he wanted to have sex. He also explained to the jury that while he "attempted to" have sex with Anna, he stopped himself. Valsin denied doing anything inappropriate with Nancy but said she saw him without his shirt on while he was with Anna, and he expressed remorse for that. Valsin admitted to the jury that he had previously accused each of the victims of lying about their allegations.

Valsin also admitted at trial to physically assaulting multiple women, including his ex-wife. Valsin agreed he has convictions for prostitution and tampering with an identification number, along with arrests for trespassing,

unlawfully carrying a weapon, and several assaults. Valsin acknowledged having thirty or forty sexual partners in his lifetime. Valsin also admitted to telling one of the State's attorneys that sex offender treatment was not beneficial to him.

### 3. Dr. Michael Arambula's Testimony

Board-certified forensic psychiatrist Dr. Michael Arambula also testified for the State. Arambula has been doing behavioral abnormality evaluations for over 15 years and has been involved in over 150 cases. Arambula testified that he "was asked to review records and evaluate Mr. Valsin and to determine whether he had a behavioral abnormality that made him likely to engage in a predatory act of sexual violence." Arambula described his methodology for conducting his behavioral abnormality evaluation. This included reviewing various records, assessments, and meeting with Valsin for over two hours. Arambula said he relied on the records to help form his opinions in this case.

Arambula testified that based on the information he had reviewed, Valsin has a behavioral abnormality that makes it likely he would engage in a predatory act of sexual violence. Arambula explained why he formed that opinion and that he was trained to look for certain risk factors for recidivism, including sexual deviance and the number of victims over time. He characterized this as the "chronicity" of the sexual deviance. Arambula attached most of the clinical weight to Valsin's sexual misconduct over the years; specifically, the number of victims, the number of

9

offending acts while on supervision, and the fact that Valsin offended despite having received treatment. Arambula testified that he attached more weight to Valsin's sexual deviance and noted that he has a personality pathology with some antisocial features. Arambula explained that antisocial personality is considered a significant risk factor for recidivism through the literature, and while Valsin has some antisocial traits, "his level isn't as serious as some of the other individuals."

Arambula said that the research indicates that if the number of victims/convictions is more than one, then the risk of recidivism rises substantially. Arambula testified that there were three convictions in this case and that he looked at other incidents, including the allegations of his stepdaughter, but he did not give them as much weight as the convictions. He explained that two of the convictions Valsin "picked up" after or during sex offender treatment, and literature indicates the risk of recidivism is higher for such individuals.

Arambula testified that he would diagnose Valsin's condition as "sexual deviance", specifically "unspecified paraphilia." He diagnosed Valsin with an unspecified personality disorder with antisocial traits. Arambula attached most of the weight to "the seriousness of his sexual deviance." He agreed with the risk factors Dr. Proctor identified. Arambula testified that Valsin did not complete sex offender treatment; in prison, he completed an education module but "[i]t was not treatment per se[,]" where Arambula indicated Valsin did "pretty well." Valsin reported

10

deviant sexual fantasies during the education program, but he talked through them instead of acting on them; Arambula testified that was "not a bad thing" because Valsin realized he could change his behavior. However, he expressed concerns about what might happen if Valsin were not in a controlled setting like prison where there are no underage females.

With respect to risk factors, Arambula testified that certain things stood out to him, including (1) the number of victims, (2) the number of acts, (3) the fact that some of the offenses occurred while on supervision and while in treatment, (4) that they happened over a long period of time, and (5) Valsin engaged in continued minimization, denial, and victim-blaming. He tried to portray himself as a victim with the girls being assertive. Arambula explained that there are no children in prison, so the more Valsin blames, minimizes, and denies, the more he can infer Valsin is still actively symptomatic with the sexual deviance. Arambula testified that other risk factors included Valsin's attitude toward women and his high sex drive.

### 4. Testimony of Dr. Randy Smith

At trial, Valsin presented video deposition testimony of psychologist, Dr. Randy Smith, who had never testified before in a case involving a "behavioral abnormality." Smith received a Ph.D. in counseling psychology and has been a licensed sex offender treatment provider since 2013. Valsin is only the second

11

individual Smith has evaluated for a behavioral abnormality. In the prior case, Smith found the individual did not have a "behavioral abnormality."

Smith felt there was a distinction between the "average sex offenders[]" and "dangerous sex offenders[,]" and his job was to discuss the reasonable doubts of whether Valsin is "one of those dangerous sex offenders." Smith testified that he did not feel that his job was to determine whether an individual had a "behavioral abnormality[] per se" but to provide an opinion about whether an individual would fall into the "[s]mall, but dangerous[]" category. Smith indicated he would look at whether someone is violent and whether they have a likelihood of re-offending.

Smith indicated that he considers the degree of psychopathy and static scores as "really important" in determining whether someone has a behavioral abnormality. Smith also looks at incidents of physical violence, which can be unassociated with any sexual offense. Smith testified that "violence, in general, is problematic." Smith denied there was any evidence Valsin had a history of serious violence. He explained that while Valsin engaged in "risky behavior[,]" he did not go out of his way to injure someone.

In assessing a behavioral abnormality, Smith did not believe he should look at whether an individual has a paraphilia. He testified that it was his job to provide an opinion to help inform the jury about whether he believed the person was more likely to engage in this behavior. He did not believe that a person could have a

behavioral abnormality but not be likely to engage in another sexually violent offense; however, he testified that it would be possible for a person to be likely to engage in a sexual offense but not have a behavioral abnormality.

Smith opined that Valsin does not have a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. He attributed this to Valsin's scores on the actuarial instruments being within the average range, "his institutional adjustment seemed satisfactory[,]" and that Valsin had certain attributes that make his transition to the community more likely to be successful. Smith testified that his methodology for providing an assessment in this case included an extensive review of records, an evaluation, scoring certain instruments, reviewing prior instrument scores, and meeting with Valsin for about two hours. He explained that the details of each offense were important in arriving at his opinion, because he used those to perform his assessment. Smith testified that he reviewed and relied on the documents in forming his opinion, including the facts contained in the various presentencing and police reports.

Smith said that the number and age of the victims was important. He testified that Valsin offending against a three-year-old while in his thirties raises his risk level and suggests a problem with impulsivity. Smith explained that this offense would assist in determining Valsin's difficulty controlling his behavior. He testified that the higher the number of convictions, the greater the risk. Smith testified that the

13

probation violation was "a big one[,]" and the failed period of community supervision is taken into account when scoring Valsin on the Static-99R and the PCL-R.

He noted Valsin "had incredibly poor judgment, engaged in a lot of risky behaviors, and had the best of intentions generally." Smith testified that Valsin never meant for anything bad to happen, he compartmentalized certain things, and he never understood the consequences of his actions. He described Valsin as "superficially contrite about his conduct[]" and "approachable."

Smith reviewed Valsin's various convictions and how they affected his opinion of Valsin's risk of repeat behavior. Smith testified that Valsin had multiple sexual encounters with Gina, and when asked whether that increased his risk, he replied, "[y]es and no." With respect to grooming Gina, Smith testified that it was "emotionally violent[]" but made it less likely that Valsin would engage in physical violence; he also felt that one who engaged in grooming was less likely to suffer from a behavioral abnormality.

With respect to the offenses against Anna and Nancy, Smith testified that the fact they occurred after Valsin had already been punished for another offense increases his risk. Smith testified Valsin told him that "I shouldn't have touched [Nancy]." Smith also explained that with Anna there was no physical violence, but she reported feeling scared and Smith conceded that "emotional intimidation" was

14

"pretty violent itself." He testified these offenses occurred while Valsin was married. Sexual promiscuity is a factor to consider regarding Valsin's impulsiveness but does not necessarily indicate an increased risk of reoffending.

Smith did not include the allegations of Valsin's stepdaughter in the victim count because the allegations did not result in a conviction. He denied seeing anything in the records indicating that Valsin may have intimidated his wife or stepdaughter. He conceded that if Valsin engaged in such behavior, that fact would affect his willingness to include the offense in his assessment.

He saw evidence of Valsin minimizing and denying, which he characterized as average compared to other sex offenders. He did not make any DSM diagnosis in this case. Smith testified that one diagnosis Valsin would receive that most incarcerated people receive is antisocial personality disorder. Smith testified that he saw no evidence that Valsin would receive a paraphilia diagnosis, but he could "live with" a "rule-out" diagnosis of pedophilic disorder. Smith did not believe Valsin preferred young children, but his hypersexuality makes him a greater risk for engaging in inappropriate sexual conduct, and Valsin engaging in sex with minors was a sexually deviant behavior.

Smith testified that Valsin had a domestic violence case that required Valsin to take anger management courses and, while that concerned Smith, he did not feel Valsin met the definition of criminal versatility and so he did not weigh it heavily in

15

his assessment. Smith testified that he spoke with Valsin about his criminal history but noted that Valsin "is not real great at taking personal responsibility." Smith testified that in prison, Valsin had very few infractions over a long period and, except for one, were not major, which he felt indicated good adjustment by Valsin.

Smith said the Static-99R was probably the best and most widely researched instrument tool that provides an actuarial assessment of risk, but it was not enough alone to determine if someone has a behavioral abnormality. Smith testified that he thought the scoring range for the Static-99R was from negative 3 to 12, and he scored Valsin at a "3." Smith testified that there was no specific cut-off score on the Static-99R to indicate a person suffers from a behavioral abnormality, but the "[h]igher, the better." Smith testified that someone with a score of "3" could still have a behavioral abnormality. He did not use the high-risk/high-needs group for Valsin, instead characterized him as a "standard sex offender[]" or an "average kind of sex offender."

Smith also scored Valsin on the PCL-R in this case and felt it was important to test for psychopathy. He did not equate behavioral abnormality with psychopathy but said it helped inform his decision. Smith scored Valsin as an 18. He testified that a score of 18 to 21 would not raise Valsin's risk, but he acknowledged on cross-examination that someone with a score of 18 to 21 could have a behavioral abnormality.

16

Smith did not believe an offender who could derive benefit from sex offender treatment would likely have a behavioral abnormality. Smith explained that Valsin needs sex offender treatment because he has not shown that he has learned to regulate his behavior outside of an institutional setting. Without additional treatment, it would raise Valsin's risk.

Smith included Valsin's stable work history, his job training, and family support as protective factors. On the other hand, Smith testified that Valsin's risk factors included multiple victims, more than one conviction, a long history of incarceration, hypersexuality, and poor social relationships with females.

### 5. Testimony of Tonya Martin

Tonya Martin, Valsin's sister, testified for Valsin. She confirmed that she had secured employment for Valsin if he were to be released. She supports her brother and does not believe he was at any risk of re-offending in the future. Martin also does not believe Valsin committed the offenses for which he has been convicted.

## II. Factual Sufficiency of the Evidence

Valsin challenges the factual sufficiency of the evidence to support the jury's finding that he is a sexually violent predator.

## A. Standard of Review

In examining the factual sufficiency standard of review, the Texas Supreme Court recently held that

17

a properly conducted factual-sufficiency review in an SVP case requires the court of appeals to determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is an SVP. In so doing, the appellate court may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony, and the court must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so. If the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient to support the verdict.

*In re Commitment of Stoddard*, No. 19-0561, 2020 WL 7413723, at *1 (Tex. Dec. 18, 2020). In other words,

in an SVP case where the burden of proof is beyond a reasonable doubt, the evidence is factually insufficient if, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the SVP finding, along with the undisputed facts that do not support the finding, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met.

*Id.* at *6 (citations omitted).

**B. Analysis**

The Texas Health and Safety Code defines a "sexually violent predator" as "a repeat sexually violent offender[]" who "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code Ann. § 841.003(a). A "[b]ehavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* §

841.002(2). Sexual assault of a child is classified by statute as a "[s]exually violent offense." *See id.* § 841.002(8)(A). The trial court provided these definitions in the jury charge.

The evidence established that Valsin has two separate convictions for sexual assault of a child. For the first offense against Gina, Valsin was placed on deferred adjudication, but he failed to comply with the terms of the community supervision and was adjudicated guilty and sentenced to prison. Thereafter, Valsin pleaded guilty to sexually assaulting Anna. In this appeal, Valsin does not dispute that he is a repeat sexually violent offender. *See id.* § 841.003(a). Therefore, we focus our inquiry on whether the evidence was factually sufficient for a reasonable jury to find beyond a reasonable doubt that he suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. *See id.*

The State presented two experts, one a forensic psychologist and the other a forensic psychiatrist. Both experts opined that Valsin suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. This is contrasted with Valsin's expert and psychologist, Smith, who opined that Valsin does not suffer from such a behavioral abnormality. Proctor and Smith both scored Valsin as a "3" on the Static-99R. The PCL-R scores that Proctor and Smith assigned Valsin deviated by only one point. Each expert opined that someone with

19

scores like Valsin on the actuarial assessments could suffer from a behavioral abnormality.

Each expert described his methodology in arriving at his opinions, and each identified Valsin's risk factors and his protective factors against reoffending. They explained which aspects of Valsin's history and offenses they weighed more heavily in assessing risk, which varied among the experts. Ultimately, the State's experts opined that Valsin suffers from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence, whereas Smith did not believe Valsin suffers from such a behavioral abnormality.

At trial, Valsin tended to minimize his conduct; however, the experts' testimony indicated that the records contradicted much of what Valsin said about the assaults. The experts, including Valsin's, also agreed that Valsin was not good at accepting responsibility for his conduct. The State's experts heavily weighed Valsin's sexual deviance in assessing his future risk as well as antisocial personality traits, which all three experts agreed Valsin displayed. While none of the experts firmly diagnosed Valsin with pedophilia, Proctor had given him a "rule-out" diagnosis of pedophilia and characterized that as a "conservative" diagnosis. Smith testified he does not provide a DSM diagnosis when conducting his evaluations. All three experts noted that Valsin engaged in hypersexual and risky behaviors. Proctor and Arambula testified that while on probation, Valsin failed to complete his sexual

offender treatment and re-offended, which were significant risk factors in their assessment. Smith similarly acknowledged that re-offending while on probation raised Valsin's risk, and failure to obtain additional sex offender treatment would raise Valsin's risk of reoffending.

Valsin argues in his brief that "[t]he evidence was factually insufficient to sustain the verdict" and that "[l]ooking at the case in a neutral light there is insufficient reason to believe that Mr. Valsin will pose such a risk that his continued confinement is justified[;]" however, the Texas Supreme Court rejected this approach. *See Stoddard*, 2020 WL 7413723, at *1 (noting that "weigh[ing] all the evidence in a neutral light" was the incorrect standard of review). Valsin further contends that "[h]e hardly has displayed the 'pattern of violent offenses' contemplated in the limitation of civil commitment 'only to a member of a small group of extremely dangerous sex offenders.'" (Internal quotations omitted.) The Texas Supreme Court also rejected this argument, noting that this "language, contained in the Act's legislative findings, is not part of the statute's definition of 'sexually violent predator' and was not an element the jury was required to find." *Id.* at *8 (citations omitted).

The jury heard conflicting opinions from the State's experts and Valsin's expert about whether Valsin suffers from a behavioral abnormality. As the Court explained in *Stoddard*, a reviewing court does not usurp the jury's role to determine

21

the credibility of the witnesses or the weight to be given their testimony. *See Stoddard*, 2020 WL 7413723, at *1. We presume that the jury resolved disputed evidence in favor of the finding and determined the State's experts were more credible, giving more weight to that testimony. *See id.* After examining the entire record, we cannot say that "the disputed evidence that a reasonable factfinder could not have credited in favor of the SVP finding, along with the undisputed facts that do not support the finding, is so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met." *See id.* at *6. Accordingly, the evidence was factually sufficient, and we overrule this issue.

### III. Admission of Evidence of Prior "No Billed" Sexual Assault

Valsin also challenges the admission of testimony regarding a prior "no billed" sexual offense against his stepdaughter. Specifically, Valsin contends that discussion of a "no billed" charge against him "was substantially more unfairly prejudicial than probative and should not have been permitted."

### A. Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion. *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000); *In re Commitment of Tesson*, 413 S.W.3d 514, 519 (Tex. App.—Beaumont 2013, pet. denied); *In re Commitment of Salazar*, No. 09-07-00345-CV, 2008 WL 4998273, at *7 (Tex. App.—Beaumont Nov. 26, 2008, pet. denied) (mem. op.). If a trial court

22

acts without reference to any guiding rules and principles, or if it acts arbitrarily and unreasonably, it is considered an abuse of discretion. *See E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995). We will not reverse a jury's verdict unless the trial court's erroneous admission of evidence probably caused the rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a)(1); *Tesson*, 413 S.W.3d at 519.

## B. Applicable Law

In SVP civil commitment proceedings, experts may disclose details regarding the underlying facts or data they relied upon in arriving at their opinion, including the details of adjudicated and unadjudicated sexual assaults. *See* Tex. R. Evid. 705(a); *In re Commitment of Stuteville*, 463 S.W.3d 543, 554-56 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *see also In re Commitment of Langford*, No. 01-18-01050-CV, 2019 WL 6905022, at *3 (Tex. App.—Houston [1st Dist.] Dec. 19, 2019, no pet.) (mem. op.). The rationale for this is that an expert's explanation of the underlying facts and how those facts shaped his or her evaluation "assists the jury in weighing the expert's opinion that the person has a behavioral abnormality, which is the ultimate issue that the jury must determine." *Langford*, 2019 WL 6905022, at *3 (citing *Stuteville*, 463 S.W.3d at 555; *In re Commitment of Talley*, 522 S.W.3d 742, 748–49 (Tex. App.—Houston [1st Dist.] 2017, no pet.)).

Texas Rules of Evidence 403 and 705 govern the admission of this type of evidence. *See generally* Tex. R. Evid. 403, 705. Rule 705(d) provides:

> If the underlying facts or data [that the expert relied on] would otherwise be inadmissible, the proponent of the opinion may not disclose them to the jury if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect. If the court allows the proponent to disclose those facts or data the court must, upon timely request, restrict the evidence to its proper scope and instruct the jury accordingly.

Tex. R. Evid. 705(d). When a trial court provides the jury a limiting instruction, we presume the jury followed it. *In re Commitment of Day*, 342 S.W.3d 193, 198–99 (Tex. App.—Beaumont 2011, pet. denied); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 771 (Tex. 2003) (stating that unless the record demonstrates otherwise, appellate courts must presume the jury followed the trial court's instructions); *In re Commitment of Alvarado*, No. 09-13-00217-CV, 2014 WL 1285136, at *11 (Tex. App—Beaumont Mar. 27, 2014, pet. denied) (mem. op.).

Likewise, Rule 403 allows for the exclusion of relevant evidence if its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. "Evidence is unfairly prejudicial when it has an undue tendency to suggest that a decision be made on an improper basis, commonly, but not necessarily, an emotional one." *In re Commitment of Anderson*, 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet.

24

denied). Under Rule 403, we conduct a balancing test considering whether: "(1) the probative value of the evidence; (2) the potential of the evidence to impress the jury in some irrational way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence." *Langford*, 2019 WL 6905022, at *4 (citations omitted).

## C. Analysis

In prior SVP commitment cases, we have considered challenges to the evidence of uncharged offenses, and each time we have held the trial court acted within its discretion in admitting evidence of uncharged conduct the expert considered in forming an opinion regarding whether a person has a behavioral abnormality. *See In re Commitment of Vicario*, No. 09-14-00003-CV, 2015 WL 575156, at *4 (Tex. App.—Beaumont Feb. 12, 2015, no pet.) (mem. op.); *In re Commitment of Womack*, No. 09-13-00552-CV, 2015 WL 474325, at *3 (Tex. App.—Beaumont Feb. 5, 2015, no pet.) (mem. op.); *In re Commitment of Turner*, No. 09-13-00402-CV, 2014 WL 4460415, at *1 (Tex. App.—Beaumont Sept. 11, 2014, no pet.) (mem. op.); *Alvarado*, 2014 WL 1285136, at *11; *In re Commitment of King*, No. 09-13-00255-CV, 2014 WL 346109, at *2–3 (Tex. App.—Beaumont Jan. 23, 2014, no pet.) (mem. op.); *Tesson*, 413 S.W.3d at 519–521; *Day*, 342 S.W.3d at 197–99.

The State's experts discussed allegations that Valsin repeatedly sexually assaulted his ten-year-old stepdaughter. Both experts explained how that factored into their evaluation of Valsin and their ultimate opinion that he has a behavioral abnormality that makes it likely he would engage in a predatory act of sexual violence. Specifically, Proctor explained that he considered the stepdaughter's allegations against Valsin because it tended to be in alignment with his overall pattern of behavior. It also went to Valsin's "persistence after punishment[,]" which Proctor indicated was a risk factor. He further described how that, along with Valsin's convictions, was factored into his rule-out diagnosis of pedophilia and sexual deviance, which Proctor considered to be Valsin's biggest risk factors for reoffending. Arambula testified that he "considered the allegation" by the stepdaughter but did not give it as much weight as he did the actual convictions. Smith testified that he did not consider the stepdaughter in the victim count because there was not a conviction associated with her allegations.

Based on the foregoing, we cannot conclude that the "probative value in helping the jury evaluate the opinion is outweighed by [its] prejudicial effect." *See* Tex. R. Evid. 705(d). With respect to a 403-balancing analysis, the evidence was highly probative of how each expert, particularly Proctor, arrived at his opinion. While there may have been some risk that allegations that Valsin sexually assaulted his stepdaughter would impress the jury in some irrational way, in the context of an

SVP trial where evidence showed Valsin pleaded guilty to sexually assaulting two other children and an indecency offense against a three-year-old, we view this risk as slight. The time taken to develop this evidence was minimal. Finally, the State's need for the evidence was great, as it went to explaining what the experts considered as Valsin's overall offense pattern and persistence after punishment.

Valsin also requested the following limiting instruction:

> Hearsay is a statement that the declarant does not make while testifying at the current trial and a party offers in evidence to prove the truth of the matter asserted in the statement. Generally, hearsay information is not admissible. TRE 801(d).
>
> Certain hearsay information contained in records reviewed by the expert may be admitted before you through expert testimony. Such hearsay information is admitted only for the purpose of showing the basis of the expert's opinion, and to allow you to assess the weight and credibility of the expert's opinion. However, this hearsay information cannot be considered as evidence to prove the truth of the matter asserted. TRE 705(d)

(Internal quotations omitted.) Pursuant to Rule 705(d), the trial court read Valsin's requested limiting instruction on three separate occasions during the proceedings and included it again in the written jury charge. Valsin never objected to the instruction. *See Alvarado*, 2014 WL 1285136, at *11 (noting defendant never objected to the requested limiting instruction). We presume the jury followed this limiting instruction in reaching their verdict. *Day*, 342 S.W.3d at 199.

Having concluded that the trial court did not abuse its discretion by permitting evidence of a no billed offense because it went to the expert's conclusion and

27

presuming the jury followed the trial court's limiting instruction, we overrule this issue.

## IV. Conclusion

We conclude the trial court did not abuse its discretion by allowing the experts to discuss allegations of a no billed prior sexual assault by Valsin, and factually sufficient evidence supports the jury's finding that Valsin is a sexually violent predator. Having overruled both issues, we affirm the trial court's judgment and order of commitment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on April 30, 2020
Opinion Delivered February 11, 2021

Before Kreger, Horton, and Johnson, JJ.